UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ELIZABETH CURRAN-GROOME,

                         Plaintiff,

-against-

THE CITY OF NEW YORK, COMMISSIONER
DERMOT SHEA, NEW YORK CITY POLICE
DEPARTMENT; CHIEF OF DEPARTMENT
TERENCE MONAHAN; INDIVIDUALLY AND AS
A POLICE OFFICER, ASSISTANT CHIEF KENNETH
LEHR, COMMANDER OF NYPD
PATROL BOROUGH BRONX ; P.O KATHERINE
TEJADA SHEILD # 6752, TAX ID # 953474,
INDIVIDUALLY AND AS A POLICE OFFICER;
JOHN AND JANE DOES # 1-2, INDIVIDUALLY AND AS
POLICE OFFICERS,

                         Defendants

| |
|---|
| **FIRST AMENDED COMPLAINT** |
| **Index No. 22-cv-710 (JPC)** |
| **PLAINTIFFS DEMAND A TRIAL BY JURY** |

Plaintiff, ELIZABETH CURRAN-GROOME, ( herein "Plaintiff," "Named Plaintiff," or

"Curran-Groome), by and through her attorney, Christopher A. Smith, as and for her Complaint,

alleges as follows:

## PRELIMINARY STATEMENT

1. On May 25, 2020, police in Minneapolis, MN, killed George Floyd. Almost immediately

    protests against police violence and in support of police accountability arose throughout the

    country. These protests, including those organized by the Black Lives Matter movement and

    others, spread across the United States and the world, including here in New York City

    where thousands exercised their constitutional right(s) to protest.

2. In the days, weeks, and months following Floyd's killing, protests occurred in New York City[1].

3. The New York City Police Department ("NYPD") deliberately engaged in activities that violated the constitutional rights of individuals who were protesting police misconduct, including, *inter alia*, corralling protesters into spaces where they could not escape, beating protestors with batons and fists, throwing protestors to the ground, kneeling on the protestors backs, necks and other parts of their bodies, using pepper spray indiscriminately, using excessive force, failing to intervene, stop, or mitigate the excessive use of force all of which ultimately resulting in injuring and arresting many of the protestors without lawful justification.

4. Upon information and belief, from May 28, 2020 through June 4, 2020, approximately 2,000 protestors were arrested by the New York City Police Department, "NYPD" throughout New York City, many of whom were subjected to excessive force, excessive detention and violations of their constitutional rights.

5. On June 4, 2020, a protest was held in the area of the Bronx known as Mott Haven ("Mott Haven protest").

6. All of the above named Plaintiffs attended the Mott Haven protest.

_____

[1] Protests in New York City were held from on or about May 28, 2020 to on or about December 20, 2020.

7.  At or prior to the time of the protests in New York City, Mayor de Blasio had issued Emergency Executive Orders related to "the presence of Covid-19 in the city" (Covid-19 Declaration of Emergency").

8.  The first Emergency Executive Order (Executive Order No 98) was issued on March 12, 2020 and was extended by Emergency Executive Order No 112 on May 9, 2020.

9.  On June 1, 2020, Mayor de Blasio issued Emergency Executive Order 117, citing the escalation of protest activity to include acts of assault, vandalism, property damage and/or looting (at unspecified dates, times and/or locations) and the Mayor ordered a city-wide curfew beginning at 11:00 p.m. on June 1, 2020 until 5:00 a.m. on June 2, 2020.

10. Upon information and belief, Mayor de Blasio issued Emergency Executive Order 118, ordering a city-wide curfew from 8:00 p.m. on June 2, 2020, until 5:00 a.m. on June 3, 2020.

11. Upon information and belief, Mayor de Blasio issued Emergency Executive Order 119, ordering a city-wide curfew from June 3, 2020 to June 8, 2020 between the hours of 8:00 p.m. and 5:00 a.m.

12. According to Emergency Executive Orders 117, 118 and 119, "a failure to comply with the Order shall result in orders to disperse." It is alleged herein that no such order to disperse or opportunity to disperse was provided to the protestors at the Mott Haven protest on June 4, 2020.

13. The NYPD, under the pretext of Mayor de Blasio's Emergency Executive Orders engaged in unlawful and impermissible violence to disrupt the those attending the Mott Haven protests

3

from exercising their rights under the First Amendment of the United States Constitution to peaceably assemble and petition for a redress of their grievances.

14. The Mott Haven protestors, including the plaintiff, were injured, arrested and physically restrained with flex-cuffs in such a manner that caused them unnecessary pain and suffering and, in some cases, possible serious and long-term nerve damage.

15. The Mott Haven Protestors were also subjected to lengthy and unnecessary arrest processing and detention that confined them in dangerously close quarters for hours, all at the height of the global COVID-19 pandemic.

16. Upon information and belief, defendants Dermot Shea, (hereinafter referred to as "Shea") Commissioner of the New York City Police Department, Terrence Monahan (hereinafter referred to as "Monahan"), Chief of Department, New York City Police, and Assistant Chief Kenneth Lehr (hereinafter referred to as "Lehr"), Commander of Patrol Borough Bronx, together formulated a plan/strategy/response to the ongoing police protests in New York City which ultimately resulted in the  suppression of  and/or mass arrest of protestors throughout New York City, including more than 250 people present at the  protest at Mott Haven, Bronx County on June 4, 2020, including the plaintiff.

17. Upon information and belief, defendant Shea has described the New York Police Department as a para-military organization, which relies on a chain of command, and that with respect to the NYPD response to protests that occurred in New York City from May through June, 2020, he personally participated in monitoring events; making decisions with respect to

planning, deployment and response; including but limited to: taking part in/at planning meetings, executive conferences, phone calls, discussions with command staff, and general oversight.

18. Upon information and belief, it was at these meetings/strategy sessions/discussions that Shea, Monahan, Lehr and others formalized the use and deployment of the NYPD Strategic Response Group operations officers, (SRG), precinct officers, TARU officers, Legal Bureau representatives, logistic support and aviation flying missions as resources to be used in a response to the protests, including the protest in Mott Haven, Bronx.

19. Upon information and belief, at these meetings/strategy sessions/discussions Shea, Monahan, Lehr and others authorized the use of chemical spray, zip ties or flex cuffs, use of SRG bikes, and police batons in response to the protest and protestors.

20. Upon information and belief, at these meetings/strategy sessions/discussions Shea, Monahan, Lehr and others formulated a plan with respect to the manner of detaining and processing those arrested.

21. Upon information and belief, at these meetings/strategy sessions/discussions that Shea, Monahan, Lehr and others formalized the use of kettling those at, in, or near the protest sites.

22. Upon information and belief, kettling derives from a German military tactic of encircling an enemy army with a superior force before annihilating the trapped military force.

23. Police, including the NYPD and other para-military forces have adapted the tactic to use against civilians purportedly to neutralize individuals seeking to engage in violent actions.

24. The targeted group is surrounded by police and/or para-military forces and prevented from leaving the area without permission of the commander of the encircling forces.

25. The individuals within the cordoned off area are not permitted to leave and can be denied access to food, water, and toilet facilities indefinitely.

26. Kettling makes no attempt to distinguish between individuals fomenting violence, peaceful protestors, and/or other civilians whose only crime is being within an area being cordoned off by the police and/or paramilitary forces.

27. Upon information and belief Monahan and the City had previously used the strategy of kettling to suppress a previous protest, i.e. at the 2004 Republican National Convention ("RNC").

28.  Upon information and belief Monahan attended and was present in his official capacity as Deputy Chief of the New York City Police Department, at the 2004 Republican National Convention ("RNC").

29. Upon information and belief the New York City Liberties Union published a report finding that the NYPD engaged in mass arrests of peaceful protestors and bystanders, severely undermining their rights at the "RNC." [2]

30. Upon information and belief, sixty-three (63) complaints were filed with the Civilian Complaint Review Board "CCRB" with respect to police violations that occurred at the

_____

[2] NY Civil Liberties Union, Rights and Wrongs at the RNC (2005), https://www.nyclu.org /sites/default/files/publications/nyclupubrightswrongsrnc.pdf

RNC. Upon information and belief, the CCRB published their own findings in 2006 and found that Monahan failed to make dispersal orders sufficiently audible and/or understandable and failed to allow protestors time to leave prior to effecting the arrests of nearly 250 people.

31. Upon information and belief, like the "RNC" the same or similar kettling tactics were used by the NYPD, Shea, Monahan and/or Lehr at New York City protests from May 28, 2020 through June 4, 2020, resulting in mass arrests, and excessive use of force on, and injury to protestors, including those attending the Mott Haven, Bronx protest "Mott Haven", which the plaintiff attended on June 4, 2020. Upon information and belief Monahan has falsely denied being familiar with the term or strategy of kettling prior to June 4, 2020

32. Upon information and belief, Shea, Monahan and/or Lehr also formulated a plan or procedure with respect to how the NYPD communicated the Emergency Executive Order 119 to police officers: through the use of phone messages, emails and use of the NYPD's internal messaging system known as "FINEST".

33. Upon information and belief, a finest message relating to Emergency Executive Order 119 was sent to NYPD police officers on June 3, 2020.

34. Upon information and belief said finest message did not inform police officers of the requirement to provide protestors with a warning before issuing a curfew violation or C-Summons.

7

35. Upon information and belief, Commissioner Shea has acknowledged that the purpose of the "warning" was so that they (the protestors) can comply and disperse without being subjected to a summons or arrest. [3]

36. Upon information and belief, Commissioner Shea subsequently acknowledged that blocking people off, preventing them from leaving, while at the same time issuing warning, to leave would be contrary to each other.

37. Upon information and belief, all NYPD police officers, at the time of Emergency Executive Orders 117, 118, and 119, were required to wear masks while on duty.

38. Upon information and belief, NYPD police supervisors, at the time of the Mott Haven protest on June 4, 2020, did not enforce the NYPD mask requirement, and the officers present at that protest and the other protests preceding it, were not wearing masks.

39. According to Monahan, Chief Kenny Lehr, the Commanding Officer of the Bronx Borough Patrol, was in charge of the NYPD planning and response to the Mott Haven protest in the Bronx on June 4, 2020.

40. Upon information and belief, Lehr was present on the ground and in command at all times during the Mott Haven protest. Monahan also acknowledged to being present at said protest.

---

[3] The New York City Department of Investigation (DOI) conducted interviews with New York Police Commissioner Shea and chief of Department Monahan. Said interviews were made part of DOI 12/18/20 report. See Investigation into NYPD Response to the George Floyd Protests, https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf

41. According to Monahan, it was Chief Lehr who made the ultimate determination relating to deployment and use of police personnel, including the use of SRG officers and SRG bikes at the Mott Haven protest on June 4, 2020.

42. Upon information and belief, Chief Lehr and Monahan, with the approval of Shea, made the decision to use Strategic Response Group officers (SRG) on roof tops, to use SRG officers and SRG bikes as well as other police officers to block, and surround ("kettle") and imprison protestors (prior to 8:00 p.m.) with police personnel.

43. Upon information and belief, it was also with Shea, Monahan, and Lehr's knowledge, authority and order that police personnel kettled protestors prior to 8:00 p.m. and made mass arrests of more than 250 individuals in the kettled area on 136th Street between Brown Place and Brook Avenue in Bronx County ("the location") on June 4, 2020, including the plaintiff named herein.

44. It is alleged herein that the defendants, individually and collectively, participated in various unlawful practices that lead to false arrests and/or excessive use of force on non-violent protestors who were exercising their first amendment rights at the time of the Mott Haven protest, and at prior police protest in New York City from May 28, 2020 through June 4, 2020, and who had not violated the Mayor's Curfew Order.

45. The unlawful policies and practices used by the defendants against protestors included the aforementioned crowd-control tactic known as "kettling" or surrounding a group of individuals with the purpose to coral, detain, and arrest them.

9

46. Once "kettled", NYPD officers indiscriminately used chemical spray, bikes, batons, hands, knees and bodies, struck protestors, and engaged in excessive force. [4]

47. On June 4, 2020 (and prior to June 4, 2020), the Defendants used kettling and similar tactics in order to prevent protestors from complying with the curfew order, to cause confusion, fear and/or hysteria, to conduct mass arrests without probable cause, and use excessive force and injury once arrested, protestors were subjected to prolonged for minor offenses, many of which were eligible to receive a C-Summons.

48. The "kettling" tactic was employed by the defendants at the Mott Haven protest prior to 8:00 p.m., on June 4, 2020.

49. Upon information and belief, defendants Lehr and Monahan gave the order to form the kettle, were present when the kettle formed, and failed to stop the kettle from forming all prior to 8:00 p.m.

50. Upon further information and belief, Lehr and Monahan failed to issue a dispersal warning prior to forming the kettle.

51. Upon information and belief, Lehr and Monahan were present and knew of the widespread use of chemical spray on peaceful protestors, the use of batons on peaceful protestors; the use

---

[4] Human Rights Watch Report: "Kettling": Protestors In the Bronx, systematic Police Brutality and its costs in the United States, (2020) documented at least 61 cases of individuals who sustained injuries, including broken nose, lost tooth, sprain shoulder, broken finger, black eyes, lacerations, scarring and nerve damage arising from police conduct at the Mott Haven protest. https://www.hrw.org/report/2020/09/30/kettling-protesters-bronx/systemic-police-brutality-and-its-costs-united-states

of excessive force on protestors; and the mass arrest of protestors, including the plaintiff named herein, and did nothing to stop it from occurring.

52. Upon information and belief, Lehr and Monahan ignored the protestors' rights and requests to be free from being kettled.

53. Once kettled, the Bronx protestors continuously chanted "let us go, let us go."

54. The defendants ignored said pleas even though it was prior to curfew.

55. Instead, officers used their bikes, their bodies, their shields and batons to coral the protestors from all sides, pushing them closer and closer together.

56. At or around 8:00 p.m., the defendants began spraying the crowd with mace, striking individually with batons, jumping on cars while swinging batons, grabbing peaceful protestors and throwing them to the ground, placing knees on their backs, striking them and engaging in various acts of brutality.

57. Upon information and belief, the City, Shea, Lehr and/or Monahan determined to effectuate the mass arrests of the protestors at Mott Haven and utilize the use of flex cuffs, to do so.

58. Although hundreds of officers were deployed, each with multiple flex cuffs, the officers were not provided with proper training in the use and application of the flex cuffs and were not provided the necessary instruments to cut or loosen the flex cuffs when they were applied too tightly.

59. This includes the flex cuffs which were applied on the plaintiff herein, all to the pain and suffering of the protestors.

11

60. Upon information and belief, the City, Shea, Lehr and Monahan determined to detain and keep the flex cuffs on the prisoners for excessive lengths of time, despite previous complaints of pain and damage stemming from improper and/or excessive length of time arresters were kept in flex cuffs.

61. At the Mott Haven protest, prisoners remained in flex cuffs even after they were placed in locked holding cells while there was no need or justifiable reasons to keep prisoners in flex cuffs.

62. The prolonged and improper use of flex cuffs caused prisoners such as the plaintiff' additional unnecessary pain and damage.

63. All of these aforementioned activities were without lawful justification, without probable cause, and without the need of force, or the need amount force utilized against the plaintiff named herein.

64. Most of the officers present at the Mott Haven protest who participated in the aforementioned events, were not utilizing COVID safety protocols including not wearing masks while making arrests, searching, touching and processing the protestors including the plaintiff.

65. The supervisors present, including but not limited to Monahan and Lehr, did not require officers to wear masks.

66. The defendants placed the plaintiff and other protestors in dangerous health situations, including transporting protestors who were part of mass arrests, including the plaintiff and other prisoners.

67. Prisoners were confined in close quarters without ventilation and without social distancing.

68. The prisoners were placed in crowded cells with prisoners who had lost their masks during their arrests, causing them further emotional trauma.

69. As stated in the Human Rights Watch Report, "police conduct during the Mott Haven protest on June 4, 2020, documented in this report, amounts to serious violations of international law human right to which the federal, state and local governments are obligated to serve".

70. These documented violations include law enforcements' "excessive use of force, violations of the right to free expression and peaceful assembly, arbitrary arrests and detentions and cruel and degrading treatments of detainees."

71. These acts of abuse by the NYPD in response to protests were not unique to Mott Haven.

72. According to a lawsuit filed by the New York State Attorney General, against the City of New York, the Mayor, Shea and Monahan, 21-cv-322 USDC, Southern District, there were 1,646 allegations of police misconduct reported between May 28 and June 20, 2020.

73. Despite evidence of widespread misconduct and constitutional violations by police officers, Shea is on record having ratified the conduct by stating that the NYPD mobilization plan was executed flawlessly in Mott Haven. [5]

_____

[5] Jake Offenheartz, Nick Pinto and Gwynne Hogan, "*NYPD's Ambush of Peaceful Bronx Protestors Was "Executed Nearly Flawlessly," City Leaders Agree*, Gothamist June 5, 2020. https://gothamist.com/news/nypds-ambush-of-peaceful-bronx-protesters-was-executed-nearly-flawlessly-city-leaders-agree

74. The City, the NYPD, the defendants, and its employees used, condoned, and were deliberately indifferent to the NYPD's practice of using excessive force against peaceful protestors and arrestees in general.

### PARTIES, VENUE AND JURISDICTION

75. Plaintiff, Elizabeth Curran-Groome, is a resident of the Town of Hopewell, County of Mercer, and State of New Jersey.

76. Curran-Groome timely filed and served a Notice of Claim on the City of New York.

77. Curran-Groome submitted to a hearing pursuant to Section 50-H of the General Municipal Law.

78. More than thirty days have elapsed since Curran-Groome served a Notice of Claim and the City as not offered and/or Curran-Groome has not accepted adjustment or payment of her claim.

79.  Defendant, City of New York is a municipal entity created and authorized under the laws of the State of New York.

80. The City is authorized by law to maintain a police department, and does maintain the New York City Police Department "NYPD", which acts as its agent in the area of law enforcement and for which it is ultimately responsible.

81. The City assumes the risks incidental to the maintenance of a police force and the employment of police officers.

82. At all relevant times herein, the city employed defendants Shea, Monahan, Lehr, Tejada, and John/Jane Does # 1-40 who were each acting in their capacities as police officers on June 4, 2020.

83. Defendant, NYPD Commissioner Dermot Shea, was at all times relevant to this Complaint, and still is, the Police Commissioner of the NYPD.

84. As Police Commissioner, Defendant Shea, personally and/or through his authorized delegates, had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures relating to mass arrest, demonstrations, protests, deployment, assignments, personnel hiring, training, supervision, retention, strategy, and discipline with respect to NYPD operations and with respect to NYPD officers' supervision and performance of their duties, and constitutes a City policymaker for whom the City is liable.

85. Defendant Terrence Monahan was, at all times relevant to this Complaint, the Chief of Department of the NYPD who had policymaking authority over the Department.

86. Upon information and belief at all relevant times, as Chief of Department, defendant Monahan, had primary and final responsibility and authority with respect to NYPD policies and operations including those related to the management of protests, use of force, and arrests.

87. Within the paramilitary structure for the NYPD, all NYPD uniformed members of the service were obligated to obey only any lawful order given by him.

15

88. Defendant Terrence Monahan is sued individually and in his official capacity.

89. Defendant Assistant Chief, Kenneth Lehr was, at all relevant times set forth herein, the Commander of Patrol Borough Bronx and is sued individually and in his capacity as a police officer.

90. Defendant Officer Katherine Tejada ("Tejada") was, at all relevant times set forth herein, an employee of the City of New York and the NYPD and is sued individually and in his capacity as a police officer.

91. Upon information and belief on June 4, 2020, at all relevant times herein, Tejada was assigned to the confines of the 40th precinct.

92. Upon information and belief, Jane Doe #1 and John Doe #2 assaulted, battered, used excessive force and arrested Curran-Groome, on June 4, 2020.

93. Defendant John and Jane Does #1-#40 were, at all relevant times set forth herein, employees of the City of New York and the NYPD and are sued under fictitious names as their identities are presently unknown.

94. This case was filed in the Supreme Court of the State of New York, County of Bronx.

95. Venue was properly laid in the Supreme Court of the State of New York, Bronx County, including because the Plaintiffs' claims arose there and because Plaintiff was damaged in a sum that exceeded the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

96. On January 27, 2022, Defendants City and Shea removed the case to this Court.

16

97. This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1343 and 1367, and 42 U.S.C. § 1983.

98. Venue is proper pursuant to 28 U.S.C. § 1391, et seq., in the Southern District of New York, where Defendant City of New York resides, and where the majority of the actions complained of herein occurred.

99. Plaintiff timely served a Notice of Claim on the municipal Defendant and complied with all conditions precedent to commencing an action under state law.

100. At least thirty days have elapsed since service of Plaintiff's Notice of Claim and adjustment and payment thereof has been neglected or refused.

101. Plaintiff has initiated this action within one year and ninety days of the accrual of Plaintiff's claims pursuant to New York State Law.

### *PRELIMINARY FACTS*

102. Upon information and belief Monahan attended and was present in his official capacity as Chief of the New York City Police Department, at the Bronx, Mott Haven protest on June 4, 2020, and gave the order to kettle the protestors and effectuate their mass arrests.

103. Upon information and belief, Lehr was present, and acting in the scope of his employment with the NYPD and the City and directed/authorized the command, strategy tactics, and oversight, supervision, of the officers present at the Mott Haven protest and

17

of the arrest of those individuals who participated in the Mott Haven protest, including the plaintiff herein.

104.     Upon information and belief Wilson was present and at all times acting in the scope of his duty as a New York City Police officer on June 4, 2020, at the Mott Haven protest in Bronx County between the approximate hours of 7:00 pm. and 9:00 p.m.

105.     Upon information and belief Speranza was present and at all times acting in the scope of his duty as a New York City police officer on June 4, 2020, at the Mott Haven protest in Bronx County between the approximate hours of 7:00 pm. and 9:00 p.m.

106.     Tejada is listed as Curran-Groome reporting/investigating officer and filed the false complaints against Curran-Groome, containing information provided by Jane Doe #1 and John Doe #2.

107.     Upon information and belief Defendant John and Jane Does #1-#40 were present and at all times acting in the scope of their duty as a New York City police officers on June 4, 2020 at the Mott Haven protest in Bronx County between the approximate hours of 7:00 pm. and 9:00 p.m.

108.     On June 4, 2020, plaintiff peacefully attended a protest taking place in the Mott Haven section of Bronx County, New York.

109.     Most of the protestors initially met at the "Hub" located at 149th Street in Bronx County.

18

110.     There was large police presence surrounding the "hub," with officers placed on

rooftops, near subways, and many were dressed in full riot gear, including Kevlar vests,

helmets and forearm plates.

111.     The protest itself was peaceful, with little or no interaction with NYPD as it made

its way toward East 136th Street, Bronx County.

112.     At approximately 7:40 p.m. – 7:45 p.m., SRG officers in full riot gear, sped past

the protestors on E 136th Street and formed a line with their bicycles at Brook Avenue,

blocking the protestors from proceeding any further.

113.     It was at that time and location that the SRG officers lifted their bicycles and used

them as weapons, pushing the protestors back, while additional officers, in white shirts

and others in blue uniform provided support behind them.

114.     Additional officers blocked the protestors from the rear, blocking any means of

escape at the intersection of 136th Street and Brown place.

115.     The sides of E 136th Street were also bounded by buildings, fences and officers.

116.     Upon information and belief the "kettle" was fully formed by the defendants at

approximately 7:45 p.m., trapping most of the protestors inside.

117.     However, most of the protestors, including Curran-Groome, were trapped in the

kettle, and unable to leave it prior to 8:00 p.m.

118.     The defendants' actions caused widespread panic, and almost immediately chants

of "let us go" "let us go" arose.

19

119.    The NYPD, including Monahan and Lehr, failed to respond to said pleas, refused to allow people to disburse, and ignored the fact that it wasn't 8:00 p.m.

120.    Furthermore, they ignored the fact that the protest had been peaceful.

121.    Instead, the defendants tightened the kettle, pushing the protestors closer and closer together during a pandemic, and SRG officers in synchronized fashioned were directed to advance with their bicycles lifted in the air pushing the protestors back.

122.    Once Curran-Groome made it out of the kettle, they walked to the far side of Brook Avenue.

### *Police Violence Against Curran-Groome*

123.    At approximately 7:45 pm Curran-Groome was "kettled" by the defendants on East 136th Street between Brown Place and Brook Ave, Bronx, NY.

124.    Curran-Groome was in front of the kettle at the intersection of Brook Ave and E 136th when she was approached by defendant Monahan and others.

125.    Curran-Groome was physically not permitted to leave said area by the defendants despite no dispersal order having been given by any of the defendants.

126.    Curran-Groom e had not committed any crime.

127.    At approximately 8:00 p.m. Curran-Groome witnessed officers attacking the protestors, hitting them with batons on their heads, arms, bodies, jumping on cars, pushing and kicking them, using pepper spray and violently arresting them. The officers'

conduct created widespread panic and confusion. The use of force was excessive, protestors were not resisting arrest.

128.     Upon information and belief, Monahan directed, ordered and/or authorized the arrest of plaintiff Curran-Groome.

129.     Upon information and belief, Defendant Jane Doe #1, identity unknown, (white shirt, helmet) immediately grabbed, seized, grabbed Curran-Groome by the arm, and violently threw Curran-Groome to the ground.

130.     Curran-Groome was not resisting arrest and posed no threat to Jane Doe #1 or to the officers.

131.     Upon information and belief, John Doe #2, identity unknown, (blue uniform, helmet) assisted in the arrest of Curran-Groome, and both he and Jane Doe #1 straddled Curran-Groone's body placing their full weight on her back/neck, while she was face down on the ground.

132.     Curran-Groome was injured by the Defendants' actions

133.     Curran-Groome was placed in handcuffs and arrested.

134.     Upon getting off the ground Curran-Groome was also placed in extremely tight zip ties or flex cuffs.

135.     Curran-Groome was placed on the sidewalk

136.     Curran-Groome was transported to the NYPD's Queens Central Booking.

137.    Curran-Groome was searched and placed in a locked holding cell which was filled with approximately 12 people.

138.    Upon information and belief, Defendant Tejada is listed as Curran-Groome' arresting officer.

139.    Upon information and belief Haldeman is listed as the supervisor approving Curran-Groome' arrest.

140.    Upon information and belief, Monahan and/or Lehr was present at the time Wilson and Jane Doe #1 and John Doe #2 committed the aforementioned acts.

141.    Upon information and belief Monahan witnessed and approved Curran-Groome' arrest and did nothing to prevent the use of excessive force on Curran-Groome, or investigate the excessive force used on her.

142.    Curran-Groome was held in custody at the Queens Central Booking, where she was fingerprinted and photographed and placed in a crowded cell.

143.    Curran-Groome was not provided food or water or an opportunity to make a phone call.

144.    As a result of the aforementioned actions, Curran-Groome was injured, physically and emotionally.

145.    Upon information and belief, Defendant Tejada was assigned Curran-Groone's arrest.

146.     Curran-Groome's zipties were replaced with metal handcuffs that were still

remained tight.

147.     Curran-Groome was transported from Mott Haven to Queens Central Booking in

Kew Gardens.

148.     Curran-Groome was made to stand outside of Queens Central Booking in the rain

for approximately (4) four hours or more, while still in the aforementioned hand cuffs.

149.     Curran-Groome was cold, wet and in terrible pain.

150.     Curran-Groome was released with a Desk Appearance Ticket (DAT), Arrest

Number B20616472 at approximately 9:30 a.m. June 5, 2020.

151.     Curran-Groome was falsely charged with Penal Law Section 240.10, Unlawful

Assembly.

152.     Throughout the entire process, Curran-Groome was handled by NYPD personnel

who were not wearing masks, he was not offered food or water and was detained in

crowded cells.

153.     Curran-Groone's detention or imprisonment was excessive in that he was held for

more than ten (10) hours.

154.     Curran-Groome was physically and emotionally injured as a result of the

defendant's actions.

155.     Hereby alleged, pursuant to CPLR 1603, that this action is exempt from the operation of CPLR 1601 from the operation of CPLR 1601, by reason of one or more of the exemptions provided in CPLR 1602.

156.     All criminal charges against Curran-Groome were dismissed and thus a favorable termination in Curran-Groome's favor was attained.

### The NYPD's History of Mishandling Protests

157.     The extensive deprivations of constitutional rights suffered by protestors including the Plaintiffs, during the 2020 protests are part of the NYPD's long history of aggressive and unconstitutional policing of certain First Amendment-protected activities going back many years, including, *inter alia,* protests denouncing the murder of Amadou Diallo in 1999, as well as protests against the World Economic Forum (the "WEF") in 2002, the Iraq War in 2003, the Republican National Convention ("RNC") in 2004, the Occupy Wall Street ("OWS") protests in 2011 and 2012, and many other protests since, including Black Lives Matter and anti-police brutality protests.

158.     The NYPD response to the protests in New York City the summer of 2020 was in line with its history of violent and unconstitutional responses to past protests challenging police conduct in New York City, including its treatment of certain First Amendment assemblies with demoralizing and brutal shows of force, rather than genuine efforts to facilitate protestors protested First Amendment activity.

159.     For example, the NYPD met protests following the start of the Iraq War in 2003

with mass arrests, excessive force, use of pepper spray, riding horses into crowds and

baton strikes to disperse protestors, and kettling to move protestors from specific

locations to effectuate mass arrests. [6]

160.     The next year, during the police "Operation Overload II" operation in response to

the Republican National Convention in 2004, NYPD members treated protestors to

similar uses of kettling tactics, excessive force and mass arrests, and excessive and

unreasonable detention. [7]

161.     The NYPD continued to employ similar mass arrest and excessive force tactics

during a years-long crackdown on Critical Mass bicycle rides beginning in 2004. [8]

162.     Similarly, during the Occupy Wall Street ("OWS") protests in 2011, the NYPD

used excessive force against protestors, bystanders, and National Lawyers Guild- New

York City Chapter Legal Observers, as well as kettling tactics to move protestors or

initiate mass arrests.[9]

---

[6] *See, e.g.*, N.Y. Civil Liberties Union, Arresting Protest (2003), available at
https://www.nyclu.org/default/files/nyclu_arresting_protest.pdf.
[7] *See, e.g.,* N.Y. Civil Liberties Union, Rights and Wrongs at the RNC (2005), available at
https://www.nyclu.org/sites/default/files/publications/nyclu_pub_rights_wrongs_rnc.pdf.
[8] *See, e.g., Callaghan v. City of New York,* 07 Civ. 9611 (PKC) (JLC) (S.D.N.Y.).
[9] *See People of the State of New York v. City of New York et al.*, 21-cv-0322, Dkt. No. 1 at ¶ 26
(S.D.N.Y.).

163.     Additionally, defendants have employed the same tactics and practices against

Black Lives Matter, police accountability, and other, similar protests, over the

intervening years.

164.     Following NYPD conduct during these and other protests, the City of New York

and the NYPD and its members have been sued repeatedly by protestors who alleged that

they had been unlawfully detained, kettled, arrested, subjected to mass arrest,

unreasonable and prolonger detentions and violations of their First Amendment and

other, related rights, much in the same manner as have the Plaintiffs in this case.

165.     In many these cases defendants employed tactics developed and modified over the

course of many years by defendants Shea, Monahan, and their predecessors and by other

defendant City policymakers at and in connection with other demonstrations in the City

dating back to around 2000 and continuing through the present, including the policies,

practices, and customs complained of herein, and also described and litigated in the

following cases:

a)   *Mandal v. City of New York.*, 02-cv-1234 (WHP) (FM) (S.D.N.Y) and related cases
     challenging NYPD's written and unwritten policies and practices enacted after the police
     shooting of Amadou Diallo in 1999 and formalized in writing as early as 2001. As a
     result of these policies, the NYPD began detaining and fully processing people arrested
     for non-criminal violations who were otherwise eligible to be processed and released with
     Desk Appearance Tickets ("DATs"). *See, e.g. "Mandal I,"* No. 02-cv-1234 (WHP), 02-
     cv-1367 (WHP), 02-cv-6537 (WHP), 2006 WL 2950235, at *4-7 (S.D.N.Y. Oct. 17,
     2006) (denying summary judgement on plaintiff's Fourteenth Amendment Equal
     Protection and First Amendment- based claims that the policies "constituted facial
     violations of [plaintiff'] First Amendment rights because they were denied DATs or
     summonses based on the fact that they participated in demonstrations"; *Mandal v. City of
     New York ("Mandal II")*, No. 02-cv-1234 (WHP), 02-cv-1367 (WHP), 2007 WL

26

3376897, at *2 (S.D.N.Y. Nov. 13, 2007) ("Mandal II") (noting that approximately 38 Mandal plaintiff prevailed at trial on claims that "the City had an unconstitutional written policy of denying persons arrested at demonstrations individual consideration for summonses and DATs");

b) *Barley v. City of New York,* 03-cv-2915 (WHP)(FM) 2005 WL 668789 (S.D.N.Y. March 23, 2005) (class action arising from mass arrests of over 200 demonstrators during 2002 WEF in New York City challenging, *inter alia*, (1) NYPD policy of detaining perceived protestors who were otherwise eligible to be released earlier with DATs for excessive periods of time and denying them consideration for DAT release on the grounds of their perceived participation in protests and (2) policy and practice of using plastic flex cuffs as unreasonable and excessive because of the manner in which the handcuffs were applied and the length of time for plaintiff were handcuffed);

c) *Allen v. City of New York,* 466 F. Supp. 2d 545, 546 (S.D.N.Y. 2006) (challenging mass arrests made in February 2002 related to the WEF alleging, *inter alia,* that the protestors remained on the sidewalk, walking two abreast and followed all rules of protesting, yet Executive Officers including defendant Monahan, arrested them and "the police deliberately held [protestors] in custody for an unnecessarily long period of time in order to delay their arraignment in Criminal Court";

d) *Haus v. City of New York*, 03-cv-4915 (RWS) (MHD) 2006 WL 1148680, *1 (S.D.N.Y. April 24, 2006) (class action challenging arrests, detentions, and prosecutions of around 300 people in connection with February 15, 2003 anti-war protests, alleging that arrests were made without probable cause and pursuant to arrestees to delayed to "engage in pre-emptive mass arrests and to subject arrestees to delayed and arduous post-arrest processing." *See also Larsen v. City of New York, et al., 04-cv-0665 (RWS) (S.D.N.Y.);*

e) *Kunstler v. City of New York,* 04-cv-1145 (RWS) (MHD) (S.D.N.Y.) and other related cases arising from alleged false and retaliatory arrests in connection with police responses to protests on April 7, 2003, raising *Monell* and other claims similar and related to the policies and practices complained of herein such as encircling protestors, striking them with nightsticks, and using extremely tight plastic handcuffs in their arrest.

f) *MacNamara v. City of New York,* 04-cv-9216 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Class Action Complaint, Dkt. No. 200-2), Abdell v. City of New York, 05-cv-8453 (RJS)(JCF) (S.D.N.Y.), Schiller v. City New York, 04-cv-7922 (RJS) (JCF) (S.D.N.Y.), Kyne v. Wolfowitz, 06-cv-2041 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Complaint, Dkt. No. 18), and the dozens of other cases consolidated for discovery purposes in the S.D.N.Y. arising from arrests made, policies related to, the

27

RNC in New York City in 2004, See, e.g., Schiller, No. 04-cv-7922 (RJS)(JCF), 2008 WL 200021 at *2-5 (S.D.N.Y. Jan 23, 2008) (nothing the City's consent to amendment of complaints in RNC cases to add, inter alia, "constitutional challenges to the defendants' alleged practice of detaining…all persons in connection with the RNC…no matter how minor the infraction, rather than issuing summonses on the street"); McNamara v. City of New York, 275 F.R.D. 125, 154 (S.D.N.Y. 2011) (certifying six "mass arrest subclasses" as well as an "Excessive Detention Class" comprised of all RNC arrestees who were processed pursuant to the RNC Mass Arrest Processing Plan handcuffed with plastic flex cuffs[.]"); Dinler, No. 04-cv-7921 (RJS)(JCF), 2021 WL 4513352, at *13-15 (S.D.N.Y. Sept. 30, 2012) (granting plaintiff' motions for summary judgement on their false arrest claims related to hundreds of people mass arrested at 2004 RNC in connection with a War Resisters League march and denying defendants' cross-motion on false arrest claims);

g) *Callaghan v. City of New York,* 07-cv-9611 (PKC)(JLC) (S.D.N.Y) (including the Third Amended Complaint, Dkt. No. 14) (multi-plaintiff litigation challenging mass arrest policies, practices, and incidents related to post-2004 RNC Critical Mass crackdown spanning several years, pleading *Monell* claims virtually identical to the core *Monell* claims pleased herein));

h) *Osterhoudt v. City of New York,* et. al., No. 10-cv-3173 (RJC)(RML), 2012 WL 4481927, at *1-2, (E.D.N.Y. Sept. 27, 2012) (and the Second Amended Complaint and Demand for Jury Trial, Dkt. No. 22) (denying defendant's motion to dismiss *Monell* claims where plaintiff, who was arrested on during mass arrest on election night in November 2008, cited other lawsuits against the City for mass arrests at Critical Mass bike rides, the 2004 RNC, and the WEF including "a number of complaints alleging that the NYPD conducted mass arrests at demonstrations and in crowd control situations, plausibly alleging a widespread departmental policy of arresting political demonstrators without determining probable cause on an individual basis");

i) Despite (then-Mayor Michael Bloomberg's recognition that "the majority of the [OWS] protestors have been peaceful and responsible," [10] there were more than ninety civil rights actions filed in the S.D.N.Y. arising from NYPD OWS arrests and related policies, including, but not limited to, the cases listed in *Marisa Holmes v. City of New York, et al.*, 14-cv-5253 (LTS) (S.D.N.Y.) (Dkt. No. 13 89) (listing by caption and docket numbers of

---

[10] Michael Bloomberg, Michael Bloomberg's Statement on the Zuccotti Park Clearance, The Guardian (Nov. 15, 2011, 8:39 EST), http://www.guardian.co.uk/world/2011/nov/15/michael-bloomberg-statement-zucotti-park.

many OWS-related cases as of March 13, 2015). Some of those cases resulted in judgements and many resulted in substantial settlements prior to trial including *Gerskovich v. Iocco*, 15-cv-7280 (S.D.N.Y. Berman, J.) that settled for $256,000 prior to trial, and which complaint had a similar failure to train *Monell* claim that had been sustained through Defense Rule 12 and Rule 56 motions;

j) In *Peat v. City of New York*, No. 12-cv-08230 (S.D.N.Y.), fifteen OWS plaintiff arrested on January 1, 2012, on the sidewalk in the East Village settled a case with Defendant City of New York for $ 598,000. The settled complaint alleged that plaintiff was peacefully and lawfully protesting when executive members of the NYPD blocked their path on the sidewalk,[11] encircled them on three sides and a building line on the fourth side. The NYPD made dispersal announcements without providing sufficient time or path of egress as members of the scooter task force blocked the protestors path of egress;

k) Other OWS-related cases have continued through discovery and are awaiting trial, including two cases involving failure to train claims similar to those at issue in this case, which are currently scheduled for trial; *Packard v. City of New York*, 15-cv-7130 (S.D.N.Y.) (AT) and *Case v. City of New York*, 14-cv-9148 (S.D.N.Y.) (AT);

l) The Plaintiffs in *Case v. City of New York*, *supra*, were arrested at an Occupy Wall Street protest and subjected to certain NYPD large-scale arrest processing rather than being released on the street with a summons as a result, including *Monell* claims with much in common with many of those raised herein. *See Case v. City of NY*, 233 F.Supp.3d 372 (SDNY 2017); 408 F.Supp.3d 313 (SDNY 2019);

m) The Union Square litigations related to the mass arrests that occurred in and around Union Square Park on September 24, 2011, alleged similar NYPD misconduct that is alleged in this pleading, including, failure to provide reasonable dispersal orders and opportunity to disperse, unnecessary and excessive force used on protestors and overall efforts of the NYPD to deter and demoralize protestors. Nearly all of these cases include multiple plaintiffs and were all settled by the City of New York, including *Clarke v. NYC*, 13-cv-(RWS); *Crisp v. NYC*, 12-cv-5482 (RWS); *Dedrick v. NYC*, 12-cv-7165(RWS);

---

[11] In March and April 2012, NYCLU issued Free Speech Threat Assessments detailing the NYPD's restriction on protestor activity and engaging in a manner to obstruct protestor's ability to engage in First Amendment activity and identified how executive "supervising officers, at random and without warning, pointed to protestors they wanted arrested for disorderly conduct, unreasonable noise, resisting arrest and obstructing governmental administration." http://www.nyclu.org/en/nyc-free -speech-threat-assessment.

*Dierken v. NYC*, 12-cv-7462(RWS); *Elliot v. NYC*, 12-cv-992 (RWS); and *Hanlin v. NYC*, 12-cv-5844(RWS);

n)  Those cases OWS related cases referenced herein, *Gerskovich, Packard, Case Peat*, the Union Square Litigations, as well as several other OWS-related cases, included failure to train *Monell* claims concerning protest activity that are similar to the *Monell* claims in this litigation;

o)  The incidents discussed in the 2003 NYCLU special report created by the NYCLU in the wake of the February 15, 2003 antiwar demonstration, titled Arresting Protest, published April 2003, available at https://www.nyclu.org/sites/default/files/publications/nyclu_pub_arresting_portest.pdf;

p)  The incidents discussed in the 2005 NYCLU special report created by the NYCLU in the wake of protests at the RNC, titled Rights and Wrongs at the RNC, published in 2005, available at https://www.nyclu.org/sites/default/files/publications/nyclu_pub_rights_wrongs_rnc.pdf;

q)  The incidents discussed in the research compiled by the Global Justice Clinic at the New York University School of Law and the Walter Leitner International Human Rights Clinic at the Leitner Center for International Law and Justice at Fordham Law School in their publication titled Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street, published July 25, 2015, available at http://hrp.law.harvard.edu/wp-content/uploads/2013/06/suppressing-protest-2.pdf; and

r)  *Edrei v. City of New York*, 16-cv-01652 (JMF)(BCM) (challenging NYPD uses of Long Range Acoustic Device ("LRAD") against perceived "group" for crowd control purposes, including *Monell* allegations challenging many of the same policies and practices herein, see, e.g., First Amendment Complaint at Paragraph 415).

### *The NYPD's Failure to Train Regarding Protest Policing*

166.    Since at least the 1990s, the NYPD had failed to appropriately train its officers on

the proper handling of First Amendment assemblies, despite being on notice of serious

constitutional deficiencies in their existing training.

167.    In fact, the NYPD's core training related to protest response to this day is based on crowd management and disorder control tactics for policing large-scale civil disorder and riots.

168.    In 1997, the NYPD's Disorder Control Unit ("DCU") created the "Disorder Control Guidelines."

169.    Upon information and belief, to this day, that document forms the core the NYPD protest response-related training.

170.    The Disorder Control Guidelines treat disorders as military engagements and copies military tactics and focus on tactics designed to deter, disperse, and demoralize groups, including by staging overwhelming presence and force at protest activity, as well as making early and "proactive" arrests, and mass arrests, using disorder control formations, encirclement or kettling, and other, similar tactics.

171.    Upon information and belief, the core NYPD training, based on the Disorder Control Guidelines, focuses on the use of such tactics to – (using the training's terminology) "disperse and demoralize" protestors.

172.    These disperse and demoralize tactics and trainings have persisted through the present including on June 4, 2020 in Mott Haven as exemplified by the experience of

Curran-Groome and other protestors who attended said protest and those of others in the summer of 2020. [12]

173.     Upon information and belief, the Disorder Control Guidelines were never meant to be guidelines for the policing of lawful First Amendment assemblies such as demonstrations – only for large-scale civil disorder such as riots.

174.     However, neither the Disorder Control Guidelines, nor upon information and belief, any related NYPD training, contain meaningful direction on the core First, Fourth, or Fourteenth Amendment principles that must guide constitutional policing of First Amendment assemblies.

175.     On information and belief, there was, and is, virtually no NYPD training – and certainly no meaningful NYPD training – focusing on how to utilize the tactics described in the Disorder Control Guidelines without infringing on the constitutional rights of protestors, such as how to make probable cause determinations or the requirements of providing an alternative avenue of protest, meaningful time and a path of egress when issuing a dispersal order, use of force to make arrests, issuance of summons, issue of flex cuffs, mass arrests, and the like.

---

[12] *See*, NYPD Responsible Investigation, New York State Officer of the Attorney General, Preliminary Report on Investigation into NYPD interaction with protestors, archive of written testimony incorporated herein by reference.

176.        Defendants' failures to train, supervise and/or retrain lead to violations of

Plaintiff's rights in this case, include, inter alia, the following:

a)  The failure to provide constitutionally meaningful dispersal disorders and opportunities to
    disperse or other, similar fair warning prior to using force or taking other enforcement
    action, including, for example, the manner in which to inform demonstrators they must
    move or disperse, how many warnings to give before taking enforcement action, the
    length of time to be given in order to provide a meaningful opportunity to comply and the
    like;

b)  The failure to make clear the need for individualized probable cause to arrest in a protest
    context;

c)  The need failure to provide training on the needs for fair warning and a meaningful
    opportunity to comply with police directions as a prerequisite for probable cause to arrest
    for a Curfew Order violation;

d)  The failure to provide training on the use of reasonable and proportionate force in
    connecting with policing First Amendment assemblies;

e)  The failure to provide training with regard to the proper application and removal of flex-
    cuffs, including how to measure the appropriate tension on flex cuffs; how to assess the
    need to remove flex-cuffs; how long flex-cuffs may be worn before a significant risk of
    nerve damage develops; the safest types of removal equipment to use and how to use
    removal equipment properly so as not to accidentally tighten flex-cuffs further in the
    process of removal; providing officers with necessary tools to remove or loosen flex-
    cuffs.

f)  The failure to provide training on the importance and need for NYPD members to wear
    masks during the COVID-19 pandemic, to provide masks for arrestees, and to allow
    arrestees to engage in mask-wearing, social distancing, handwashing, and other similar
    safety measures in light of the COVID-19 pandemic.

g)  The duty to intervene, stop, mitigate, and report officers who use excessive force while
    policing said event.

h)  The failure to provide training in de-escalation techniques. [13]

i)  The duty not to use excessive or unnecessary force.

177.    Although many of the above problems with the NYPD's training are endemic and cut across all of the relevant NYPD training, at present, defendant City has a policy and practice of deploying one particularly problematic, inadequately trained, poorly supervised and disciplined group of NYPD members: the NYPD's Strategic Response Group ("SRG").

178.    The SRG, deployed around the City at protests in 2020 including those that are the subject of this lawsuit, was created in 2015 as a specialized unit tasked with responding to disorder-causing events and to conduct counter-terrorism operations.

179.    The SRG has a unit in each of the five boroughs and the DCU has now been incorporated into the SRG.

180.    In response to the public's skepticism that the SRG would be used to crack down on protests, then- Chief of Department James O'Neill stated: "They will not be involved handling protests and demonstrations. They'll have no role in protests. Their response is

---

[13] See 2015 NYPD Office of Inspection General Report finding that NYPD use of force policy is vague and imprecise and provides insufficient instruction on de-escalation.

single-fold. They'll be doing counter-terror work. They'll be assigned to different posts throughout the city." [14]

181.     However, since 2015, the SRG has been regularly deployed at protests, including those in 2020 related to the present lawsuit.

182.     Upon information and belief, SRG members, including many of those deployed to the protests in 2020 that are the subject of this lawsuit, have histories of engaging in the kinds of misconduct complained of herein, documented among other places, by CCRB complaints, and in numerous lawsuits. [15]

183.     SRG members are meant to have additional DCU training.

184.     Upon information and belief, that additional DCU training is principally modelled on the core principles and tactics in the Disorder Control Guidelines.

185.     However, upon information and belief, many of the officers deployed to respond to the protests in 2020, including Mott Haven, did not even receive that training, which was supposedly required of them.

---

[14] Ben Yakas, NYPD: Fine, Maybe We Won't Police Protests With Machine Guns, Gothamist, Jan. 30, 2015, available at https://gothamist.com/news/nypd-fine-maybe-we-wont-police-protests-with-machine-guns.
[15] Ali Winston, NYPD Unit at Center Of Protest Policing Has Dozens Of Officers With Long Misconduct Histories, The Appeal, Oct. 15, 2020, available at https://theappeal.org/nypd-srg-misconduct/.

186.     As a result, as noted in the OCC Report, "for a majority of the officers who were assigned to the George Floyd protests, their training on policing protests was limited to what they had received in the Academy. [16]

187.     Between at least 2004 and the present, the NYPD's mass arrest and violent crowd control and protest policing tactics have been on full display in the streets of New York City; the subjects of unfavorable coverage in the media, including coverage explicitly showing video evidence of NYPD members engaging in uses of excessive force in connection with crowd control while policing protests; documented in complaints to the Civilian Complaint Review Board and other agencies; as well as the litigations discussed above, which have cost the city tens of millions of dollars in judgements and settlements.

188.     Indeed, in connection with the 2002 World Economic Forum and the 2004 RNC policing operations, NYPD supervisors – including DCU supervisors charged with designing and implementing NYPD protest policing-related policies and related training – routinely created "after action reports" that documented and critiqued NYPD plans for and responses to protest activities.

---

[16] OCC Report at 37.

36

189.     For example, in a March 17, 2006 New York Times article that was published while discovery about related policies and practices was ongoing in the 2004 RNC litigations, "Police Memos Say Arrest Tactics Calmed Protest," Jim Dawyer reported on the revelation of 2002 WEF after-actions reports in then-ongoing litigation, *Allen v. City of New York*, 03-cv-2829 (KMW) (GWG) (SDNY). [17]

190.     Those reports praised employing militarized tactics such as the "staging of massive amounts" of officers in riot gear including riot helmets and militarized "equipment" such as armored vehicles, prisoner wagons, and buses in view of demonstrations in order to "cause them to be alarmed" and as a "deterrent" as well as the use of "proactive" arrests in order to have a "powerful psychological effect" on protestors.

191.     After the 2002 WEF after-action reports were disclosed in Allen and the 2004 RNC-related after-action reports were disclosed in the RNC litigations, and some of them were made public as a result, upon information and belief, the NYPD opted to discontinue creating such reports, documented and assessed the NYPD's protest policing-related policies and tactics.

_____

[17] Jim Dwyer, "Police Memos Say Arrest Tactics Calmed Protest, "N.Y. Times, March 17, 2006, available at https://www.nytimes.com/2006/03/17nyregion/police-memos-say-arrest-tactics-calmed-protst.html.

192.     Upon information and belief, according to the Corporation Counsel's report, NYPD records do not show any protest-related after action reviews undertaken between the 2004 Republican National Convention until the events of the George Floyd protests.

193.     Nevertheless, upon information and belief, at prior to and during the summer of 2020 protests, Shea, Monahan, Lehr and other defendant City policymakers would routinely receive reports regarding arrests made in connections with First Amendment assemblies.

194.     Said "internal reports" including but not limited to: Unusual Occurrence Reports; Mass Arrest Reports including data tracking arrestees, the length of time it took them to go through the system, whether they were released with a summons or DAT, their proposed arrest charges, and other information related to the status and/or dispositions of the cases; internal critiques from supervisors and other officers involved in mass arrests related to police actions taken in relation to an event; and/or other reports including information arrests, use of force protest arrest processing, and/or prosecutions.

195.     Despite the wealth of evidence of NYPD members' historical brutality against protestors, defendant City has ignored, and/or failed to utilize relevant information, including information gleaned from complaints, investigations, news coverage reports and lawsuits, as well as other data points, to identify deficiencies in NYPD training as it related to constitutionally complaint protest policing, and policing in general such as de-escalation techniques and proper use of force.

38

196.     For example, in a deposition in *Packard v. City of New York*, 15-cv-7130

(S.D.N.Y.) (AT), a witness for the City of New York testified that in regard to protest

police training it did not review (i) decline to prosecute decisions, (ii) conviction

conversation rates or (iii) allegations and settlements in lawsuits relating to protests.

197.     As another example, defendant City apparently does not take allegations in

lawsuits filed by protestors claiming they were falsely arrested during protests into

account in considering its protest policing-related polices and training, in effect taking the

position that there is nothing to be learned from lawsuits and settlements.

198.     For example, in a 2017 deposition, a Fed. R. Civ. P. 30(b) (6) witness designated

to testify on sidewalk policy protesting, dispersal orders, and training on probable cause

standards for crimes commonly charged in protest policing by the defendant City could

identify no impact that litigation against City between 2000 and 2011 had on defendant

City's relevant polices, practices, customs, or NYPD training.

199.     Relatedly, according to the Corporation Counsel, "the NYPD does not

demonstrate a consistent commitment to reviewing and responding to external critiques

regarding the policing of protests." [18]

200.     At bottom, the NYPD's near-exclusive focus on deterring, dispersing, and

demoralizing in trainings related to policing protests, coupled with the failure to train on

---

[18] OCC Reports at 2, 30.

specific, relevant aspects of constitutional policing of protests, let alone how to encourage or facilitate protests- despite having received clear notice that NYPD policing of protests has caused the systemic violations of protestors' constitutional rights for years – demonstrates both a history and a policy, of disregard for the First Amendment, Fourth Amendment, Fourteenth Amendment, and other related rights of Plaintiffs and other similarity injured protestors.

### The NYPD's Policy and/or Practice of Using Excessive Force to Control the Speech of Protestors

201.     Defendants used types and levels of force that were excessive and unnecessary force against the Plaintiffs and other similarity situated protestors.

202.     In many cases, those uses of force were in contravention of, or inconsistent with, related, written NYPD polices and/or training.

203.     Upon information and belief in many cases, defendants failed to document, and/or require that fellow defendants and/or fellow officers' document, uses of force in accordance with related NYPD policies and/or training.

204.     Further, upon information and belief, the defendants used force against plaintiff based on their position in or proximity to a perceived group, without first having given the perceived group clearly communicated prior notice as well as a meaningful opportunity to comply with police orders and/or dissociate with the perceived group.

205.     Defendants used types of force, such as deploying pepper spray or mace, that they knew, or should have known, would impact numerous people at one time, and/or cause

lasting pain, suffering, and/or injury, without making individualized or otherwise appropriate determinations about whether those uses of force were necessary, justified, or reasonable under the circumstances.

206.     Additionally, Plaintiffs and others arrested at the protest that are the subjects of this litigation were handcuffed with their wrists together and their hands behind their back with plastic flex-cuffs for hours.

207.     In many cases, Plaintiffs and/or other arrestees complained about the fact that their flex-cuffs were too tight causing them pain and/or causing them injury.

208.     Specifically, because they were arrested at a protest, Plaintiffs were subjected to tight and extensive time being held in flex-cuffs pursuant to defendant's Protest Arrest Processing Policies. Defendant City did not supply defendants with enough of cutting tools with which to loosen or remove flex-cuffs, or any flex-cuffs pads, which are designed to prevent the very types of injuries Plaintiffs and other arrestees suffered as a result of having flex-cuffs applied to them.

209.     It was no secret to defendants that using flex-cuffs to restrain protestors- including without providing adequate numbers of cutting tools or any protective padding – would result in injuries to protestors, of the sort that appropriate policies, training, and/or supervision would have been avoided.

210.     For example, *Burley v. City of New York*, 03-cv-2915 (WHP) (FM) 2005 WL 668789 (S.D.N.Y. March 23, 2005) was a class action arising from mass arrests of over

200 demonstrators during 2002 WEF in New York City challenging, *inter alia,* the

NYPD's then-policy and practice of using plastic flex cuffs as "unreasonable and

excessive because of the manner in which the handcuffs were applied and the length of

time for plaintiff were handcuffed."

211.    Plaintiffs in *Kunstler v. City of New York*, 04-cv-1145 (RWS)(MHD) (S.D.N.Y.)

and other related cases arising from alleged false and retaliatory arrests in connection

with police responses to protests on April 7, 2003, also raised *Monell* claims around

NYPD members' use of extremely tight, plastic handcuffs.

212.    Additionally, in *McNamara v. City of New York*, 04-cv-9216 (RJS) (JCF)

(S.D.N.Y.), the Court certified a "Conditions of Confinement Class, comprising all RNC

arrestees who were handcuffed with plastic flex cuffs." *See McNamara v. City of New*

*York*, 275 F.R.D 125, 154 (S.D.N.Y. 2011)

213.    Those cases, and many others, challenged the City's and NYPD's policies and

practices regarding the use of flex-cuffs to restrain protestors, and put the defendants in

this case on notice of the potential for injury and harm suffered when the flex cuffs are

applied improperly, and for too long a period of time.

214.    Relatedly, the DOI Report found, "When voicing those concerns to their arresting

officers or other officers in the area, arrestees were told that the officers lacked the

necessary equipment to remove the flex-cuffs. Arrestees therefore had to wait, oftentimes

for long periods, until they got to their respective arrest processing center so that flex-cuffs could be removed." [19]

### Defendants' Policies and Practices Regarding Arrests – Including Mass Arrests – Without Fair Warning – Or an Opportunity to Comply

215.    As set forth in this complaint the NYPD used a tactic known as kettling to surround, trap and prevent movement by the protestors from leaving the "kettle" area.

216.    The defendants had used these tactics at prior protests as well.

217.    Not only didn't the defendants allow the protestors to leave the kettled area prior to the 8:00 p.m. curfew, but they also failed to give constitutionally meaningful and adequate dispersal orders and meaningful opportunities to disperse prior to making arrests where such notice and opportunity were required.

218.    As a result, most of the protestors at Mott Haven (and in other protests which preceded it) were arrested in connection with perceived violations of Mayor de Blasio's Curfew Orders, or for perceived violations of New York Penal Law 240.20(6) (Disorderly Conduct – Failure to Obey Lawful Dispersal Order), yet defendants failed to give constitutionally meaningful and adequate dispersal order and meaningful opportunities to disperse prior to making such arrests, and/or ensure that each such arrested Plaintiff had the state of mind required for such arrest.

---

[19] *See, e.g.*, DOI Report at 42. See also, AG Report at 29 ("Officers kept the [flex-cuffs] on their wrists even after they were placed in cells, which, for some, cut off their circulation or caused other injuries to their wrists, including cuts and nerve damage.")

219.    With respect to de Blasio's Curfew Orders, the plain language of de Blasio's Curfew Orders required both (a) a knowing violation of the Executive Order prior to any arrest and (b) that any arrest could only follow a dispersal order, a meaningful opportunity to disperse, and a person's refusal to comply with the order.

220.    As plead elsewhere herein, defendants enforced the Curfew Orders by arresting Plaintiffs and other protestors without first ensuring that they had been given dispersal orders, meaningful opportunities to disperse, and that their refusal to comply was either knowing or voluntary. In sum protestors were arrested under circumstances in which the defendants had not ensured that arrestees had knowingly violated the Curfew Orders.

221.    That enforcement was consistent with official NYPD policy, or at a minimal was treated with deliberate indifference

222.    The defendants' acted with a policy, custom or pattern of trapping protestors prior to curfew and then enforcing said curfew by arresting those who were trapped and not permitted to leave.

223.    The defendant City was deliberating indifferent to this aforesaid practice, and despite knowing that if was occurring, took no steps to stop it from continuing.

### Retention Of "Bad Officers"

224.    The "City" knew of the widespread use of excessive force by its police force prior to on June 4, 2020 yet continued to employ and promote its officers without any

44

discipline, meaningful retraining oversight or consequences for their bad acts or actions, including the defendants herein.

225.    This practice of retention of "bad" officers was not unique to Wilson, Zaino, or the other defendants, but was a practice adopted by the defendant City and/or NYPD, and/or was treated with deliberate indifference by the City and/or NYPD.

226.    In a New York Times article published November 15, 2020 titled <u>A Watchdog Accused Officers of Serious Misconduct: Few were Punished</u>, by Ashley Southall, Ali Watkins and Blacki Miglozzi[20], it reported that of the 6,900 misconduct charges recommended by the CCRB in which the highest level of discipline was recommend, the NYPD ignored 71% of the recommendations and routinely downgraded the charges. This included the nullification or downgrading 26 of the 28 recommended cases since the current police commissioner, Dermot Shea has been in charge of the NYPD.

227.    The Times article found after reviewing charges brought against 3,188 officers, that the Police Department followed the Review Board's recommendations less than 20 percent of the time; that fewer than one in five officers received punishment ranging in severity from 1 lost day vacation to 12 months of dismissal probation; that just seven officers were fired (and only after being convicted of a crime in court); and that many officers had multiple findings against them, but continued to be promoted.

_____

[20] https://www.nytimes.com/2020/11/15/nyregion/ccrb-nyc-police-misconduct.html

228.    It is in this atmosphere, which was created, permitted or acted upon with

deliberate indifference by the City, which allowed the constitutional violations of plaintiff

to occur and permitted the defendant officers to act with impunity at the Mott Haven

protest.[21]

### *Defendant's Protest Arrest Processing Policies and Practices*

229.    Defendants arrested Curran-Groome for alleged offenses which New York

Criminal Procedure Law 150.20 required then to grant Curran-Groome summonses on

the street in lieu of a fuller or lengthier detention; and/or in connection with which, under

the NPYD policies and practices that are applied in non-protest contexts, arrestees are

taken directly to a nearby local precinct, and released in an average of between around

two and four hours with a summons.

230.    However, because defendants arrested Curran-Groome and other arrestees in

connection with a protest, defendants subjected him and them to defendants' Protest

Arrest Processing Policies, which involved, among other components, placing Curran-

---

[21] In an article published in NOVA, <u>Study finds misconduct spreads among police officers like, contagion</u>, by Katherine Wu, 5/27/19 (<u>https://www.pbs.org/wgbh/nova/article/police-misconduct-peer-effects/</u>), it cites research reported in the Journal Nature Human Behavior, Edika G. Quispe-Torreblanca and Neil Stewart, *Causal peer effects in police misconduct*, Nature Human Behavior, Vol 3, August 2019, 797-807, <u>https://www.nature.com/articles/s41562-019-0612-8.epdf</u>, that found retaining misbehaving police officers increased the likelihood that those around them would be accused of bad behavior as well. Therefore, transferring bad behavioral officers to other units, or engaging of in a code of silence could impair the integrity of "law abiding" officers and feed also spread improper police practices.

Groome and other arrestees in flex-cuffs and removing them from the street to a centralized arrest processing location such as a Mass Arrest Processing Center ("MAPC"), where defendants subject them to a large scale arrest processing procedures and Mass Arrest Processing Plan ("MAPP") rather than issuing them summonses, and releasing them from custody, on the street.

231.     Additionally, as a result, instead of detaining Curran-Groome and other arrestees for a relatively brief period of time on the street, issuing them summonses, and releasing them, defendants subjected Curran-Groome and others to flex-cuffing as well as unreasonably lengthy, onerous arrest processing, significantly increasing the amount of time they would otherwise have been in custody and exposing them to inappropriate and especially hazardous conditions of confinement, as well as searches of their persons and property, and/or seizures and/or retentions of their property without adequate pre- or post-deprivation notice and/or opportunity to be heard to challenge the grounds for seizing and/or retaining the property.

232.     In other cases, NYPD members seized and retained property from Plaintiffs and other arrestees without providing them with the NYPD paperwork required by NYPD policies, practices, and procedures to retrieve property was closed.

233.     In still other cases, NYPD members seized and retained property without providing Plaintiffs with a meaningful opportunity to retrieve it, for example because the location at which defendants were retaining the property was closed.

234.     The conditions of confinement were unsafe and overcrowded, particularly in the context of the COVID-19 pandemic, and/or filthy and/or unsanitary; and lacked appropriate access to phone calls, food, water, bathrooms soap and/or hand sanitizer, other hygienic products such as tampons, and/or other basic necessities.

235.     With particular respect to the COVID-19 pandemic, during Plaintiffs' confinements, the State of New York and defendant City, had advised people to comply with social distancing, to wear masks, and to engage in practices such as hand-washing; and defendant City, as well as defendants Shea, Monahan, Lehr and other NYPD members, enforced Executive Orders issues by Mayor de Blasio requiring people to engage in social distancing and/or mask-wearing, all on an emergency basis.

236.     However, as part of defendants' Protest Arrest Processing Policies and MAPP, instead of detaining Curran-Groome and other arrestees for a relatively brief period of time on the street, issuing them summonses, and releasing them, defendants transported Plaintiffs to a MAPC or other centralized arrest processing location, in close, forced proximity to other arrestees and NYPD members, many of whom were not wearing masks, rendering social distancing impossible.

237.     Relatedly, many defendants and other nearby NYPD members were not wearing masks while arresting and/or using force on and/or detaining plaintiff.

238.     Also relatedly, defendants and other NYPD members removed masks of many

plaintiff and other arrestees who had masks at one point prior to a during their arrest or

detentions.

239.     Also as part of defendants' Protest Arrest Processing Policies and MAPP,

defendants subjected plaintiff and other arrestees to conditions of confinement in which

they were unable to wash their hands or otherwise engage in other, similar hygienic

practices that the State and City were recommending for public health and safety.

240.     Defendants knew or should have known that, as a result of subjecting plaintiff and

other arrested to defendants'' Protest Arrest Processing Polices and MAPP, they would

deprive Plaintiffs and other arrestees of basic needs, including for example the need to

stay safe from COVID-19, as well as unreasonable risks of serious damage to their

physical and/or mental health or safety through potential exposure to COVID-19.

241.     Defendants acted intentionally to impose those conditions because they subjected

plaintiff and other arrestees to defendants' Protest Arrest Processing Policies and MAPP.

242.     Additionally, defendants recklessly failed to act with reasonable care to mitigate

the risks that they conditions posed even though they knew or should have knew that they

posed excessive risks to Plaintiffs' physical and/or mental health or safety through

potential exposure to COVID-19.

**_Defendants' Failure to Monitor and Supervise NYPD Members' Protest Policing_**

49

243.     Although defendants City, Shea, Monahan, Lehr and other policymakers actually

knew, or should have known, that NYPD members were engaging in or had engaged in

the unconstitutional conduct complained of herein, they failed to monitor, supervise,

and/or discipline NYPD members who directed, engaged, or observed such conduct.

244.     For example, despite statements made by Mayor de Blasio and Commissioner

Shea in the media indicating they had knowledge of events related to violence and mass

arrests at the protests as they were unfolding, and the wealth of video and other evidence

that has been widely available in their intervening months, upon information and belief,

virtually no NYPD members have been meaningfully investigated or disciplined related

to their conduct.

### *Reports and Investigations in the 2020 Protests*

245.     In July 2020, the New York State Office of the Attorney General ("the AG")

issued a preliminary report on the NYPD's response to the May and June protests ("the

AG Report").[22]

246.     The AG Report found that most complaints received by the AG were allegations

of excessive force, kettling, false arrests, and excessive force against protestors as well as

---

[22] New York State Office of the Attorney General, Preliminary Report on the New York City
Police Department's Response to the Demonstrations Following the Death of George Floyd,
("AG Report"), July 2020, available at http://ag.ny.gov/sites/default/files/2020-nypd-report.pdf.
The Plaintiffs herein incorporate by reference into this case the facts set forth in the AG Report.

similar misconduct directed at the press, National Lawyers Guild – New York City Chapter Legal Observes, elected officials, and essential workers.

247.    The AG Report also found the pervasive use and misuse of tightly fastened flex-cuffs during arrest, NYPD officials covering their badge numbers, and failure of NYPD officers to wear protective face coverings to protect themselves and others against the spread of COVID-19.

248.    In December of 2020, the NYC Department of Investigation issued a report examining the NYPD's conduct in response to the 2020 Black Lives Matter protests ("DOI Report").[23]

249.    The DOI Report found, inter alia, that the NYPD lacked a sufficiently tailored strategy to respond to protests, used force and tactics of crowd control that led to excessive force and "heightened tensions," made decisions based on intelligence that lacked "context or proportionality," and deployed officers who lacked sufficient training in responding to protests.[24]

250.    In addition to noting the heavy-handed response by the SRG at the 2020 protests, the DOI Report found that officers not from SRG lacked "any recent training related to protests."[25]

---

[23] *See*, DOI Report, *supra*.
[24] *Id.* at 36.
[25] *Id.* at 61.

251.     The DOI found that NYPD policies do not have specific First Amendment protest expression policing and failed to distinguish polices for serious civil disorders and riots from those applicable to peaceful First Amendment expression.

252.      The DOI distinguished between protest facilitation and protest control, regulation, or suppression.

253.     The former is preferred to allow for First Amendment expression, the DOI Report found, but the NYPD employed protest control during the 2020 protests.

254.     According to the DOI Report, between May 28 and June 5, 2020, approximately 2,047 individuals were arrested during demonstrations.[26]

255.     The DOI also found that Black arrestees were disproportionately charged with felonies.[27]

256.     The DOI also found that "the force required to carry out a mass arrest was disproportionate to the identified threat," and "placed the burden of potential crime on a wide swath of people who had no apparent connections to that potential criminal activity.[28]

257.     According to the DOI Report, between May 28 and June 20, 2020, the CCRB had received 1,646 protest-related allegations related to 248 incidents.[29]

---

[26] Id. at 26.
[27] Id. at 27.
[28] DOI Report at 56.
[29] Id. at 28.

258.     In September of 2020, Human Rights Watch issued a detailed analysis of the Mott

Haven protest ("the HRW Report") describing the preplanned and coordinated disruption

of the march by the NYPD, including by Chief Monahan, who was present at the NYPD

mobilization.[30]

259.     The HRW Report describes the systematic kettling of protestors in Mott Haven

before the 8:00 p.m. curfew and the subsequent excessive force and mass arrest of the

marchers, including National Lawyers Guild – New York City Chapter Legal Observes,

as well as medics, all of whom were classified as essential workers exempt from the

Mayor's Curfew Orders.

260.     Notwithstanding these reports condemning the conduct of the NYPD, following

the Mott Haven protest, Defendant Shea ratified the misconduct that occurred when he

said the mobilization by the NYPD in Mott Haven was "executed nearly flawlessly." [31]

261.     Defendant City and NYPD leadership and policymakers knew the department and

its officers had problems with constitutionally policing protests but failed to adequately

train and otherwise prepare its officers to respond to the 2020 protests, prevent its officers

---

[30] Human Rights Watch, "Kettling" Protestors In The Bronx: Systemic Police Brutality And Its
Costs In The United States ("HRW Report"), Sept. 2020, available at
https://www.hrw.org/report/2020/09/30/kettling-protestors-bronx/systemic-police-brutality-and-
its-costs-united-states.
[31] "NYPD's Ambush of Peaceful Bronx Protestors Was "Executed Nearly Flawlessly," City
Leaders Agree, *supra*.

from committing the same acts of misconduct, or discipline officers who engaged in such misconduct.

## AS AND FOR THE FIRST CAUSES OF ACTION AGAINST ALL DEFENDANTS FOR FALSE ARREST, PLAINTIFF CURRAN-GROOME ALLEGES:

262.      The Plaintiffs repeat, reiterates and realleges each and every allegation contained in paragraphs marked "1" through "254" with the same force and effect as if more fully and at length set forth herein.

263.      The defendants lacked probable cause or reason to have arrested Curran-Groome on June 4, 2020.

264.      Curran-Groome did not commit any crime to the point when she was stopped, seized, assaulted, battered, and arrested by the defendants.

265.      Curran-Groome' arrest was unlawful.

266.      That by reason of the aforesaid false arrest Curran-Groome was injured and subjected to great indignity, humiliation, pain and great distress of mind and body, and Curran-Groome has been otherwise damaged.

267.      That by reason of the aforesaid, Curran-Groome has been damaged in a sum in excess of the jurisdictional limit of the lower courts.

## AS AND FOR THE SECOND CAUSES OF ACTION AGAINST ALL DEFENDANTS FOR FALSE IMPRISONMENT, CURRAN-GROOME ALLEGES:

268.    The Plaintiffs repeat, reiterate, and reallege each and every allegation contained in paragraphs marked "1" through "262" with the same force and effect as if more fully and at length set forth herein.

269.    The defendants lacked probable cause or reason to have arrested and imprisoned Curran-Groome on June 4, 2020, at approximately 7:50 p.m.

270.    That said false imprisonment of Curran-Groome continued through June 5, 2020 at approximately 9:30 a.m. when Curran-Groome was released.

271.    That at all times Curran-Groome was conscious of her imprisonment, did not consent to the imprisonment, and said imprisonment was unlawful.

272.    That by reason of the aforesaid false imprisonment Curran-Groome was injured and subjected to great indignity, humiliation, pain and great distress of mind and body, and the said plaintiff has been otherwise damaged.

273.    That by reason of the aforesaid, Curran-Groome has been damaged in a sum exceeding the jurisdictional limit of the lower courts.

## AS AND FOR THIRD CAUSES OF ACTION AGAINST ALL DEFENDANTS FOR ASSAULT AND BATTERY, PLAINTIFF CURRAN-GROOME ALLEGES:

274.    The plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs marked "1" through "266" with the same force and effect as if more fully and at length set forth herein.

275.    On June 4, 2020 at approximately 7:45 p.m. Curran-Groome was violently seized, grabbed, thrown to the ground, straddled, ziptied, handcuffed, arrested and later

fingerprinted, searched and touched by the defendants in a manner that was not privileged, was offensive to the plaintiff, was without the plaintiff's permission or consent and not authorized by law.

276.     That said acts and actions by the defendants constitute an assault and battery of Curran-Groome's person, causing her physical and emotional harm.

277.     That by reason of the aforesaid assault and battery, Curran-Groome was injured and subjected to great indignity, humiliation, pain and great distress of mind and body, and the said plaintiff has been otherwise damaged.

278.     That by reason of the aforesaid, Curran-Groome has been damaged in a sum exceeding the jurisdictional limit of the lower courts.

## AS AND FOR THE FOURTH CAUSES OF ACTION AGAINST ALL DEFENDANTS FOR EXCESSIVE USE OF FORCE, PLAINTIFF CURRAN-GROOME ALLEGES:

279.     The Plaintiff, Curran-Groome, reiterates and realleges each and every allegation contained in paragraphs marked "1" through "271" with the same force and effect as if more fully and at length set forth herein.

280.     As set forth above Curran-Groome on June 4, 2020 at approximately 7:45 p.m. Curran-Groome was violently seized, grabbed, thrown to the ground, straddled, ziptied, handcuffed, arrested and later fingerprinted, searched and touched by the defendants in a manner that was not privileged, was offensive to the plaintiff, was without the plaintiff's permission or consent and not authorized by law.

281.     Curran-Groome was not unlawfully assembling under Penal Law Section 240.10.

282.     That said acts and actions by the defendants towards Curran-Groome were excessive and beyond all reasonable means of force necessary that a reasonable officer would use under the same or similar circumstance.

283.     The defendants failed to utilize any de-escalation techniques prior to violently assaulting and battering Curran-Groome.

284.     The amount of force utilized by the defendants was excessive in that it was more than necessary to gain control of Curran-Groome.

285.     No officer present at the location intervened or stopped the use of excessive force.

286.     That the defendants ignored the plaintiff Curran-Groome' cries and that of civilian onlookers to stop what they were doing.

287.     That Curran-Groome engaged in no act or actions which would justify the aforementioned use of force by the defendants against her.

288.     That by reason of the aforesaid excessive use of force, Curran-Groome was injured and subjected to great indignity, humiliation, injury, pain and great distress of mind and body, and the said plaintiff has been otherwise damaged.

289.     That by reason of the aforesaid, Curran-Groome has been damaged in a sum exceeding the jurisdictional limit of the lower courts.

## AS AND FOR THE FIFTH CAUSES OF ACTION ON BEHALF OF THE PLAINTIFF CURRAN-GROOME AGAINST ALL DEFENDANTS FOR FAILING TO INTERVENE, MITIGATE OR STOP

290.     Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs marked "1" through "282" with the same force and affect as if more fully and at length set forth herein.

291.     Upon information and belief, the named defendant "officers" were in the immediate vicinity of Curran-Groome at the "location" at the time when Curran-Groome was assaulted, battered, subjected to excessive force and falsely arrested. The defendant failed to take any steps to stop, prevent, or mitigate the harm to Curran-Groome.

292.      Upon information and belief, defendants were under a duty to act yet failed to do so when Curran-Groome was assaulted, battered, subjected to excessive force, and falsely arrested.

293.     That the above acts committed by the defendants constituted a failure to intervene, proximately causing or contributing to the physical and emotional harm endured by Curran-Groome.

294.     That by reason of the aforesaid, Curran-Groome has been damaged in a sum exceeding the jurisdictional limits of lower courts.

## AS AND FOR THE SIXTH CAUSES OF ACTION ON BEHALF OF THE PLAINTIFF CURRAN-GROOME AGAINST THE "CITY" FOR NEGLIGENCE

295.      Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs marked "1" through "287" with the same force and affect as if more fully and at length set forth herein.

296.     That the defendant, "City" was careless and reckless in hiring, retaining, training, assigning, supervising, monitoring, observing, disciplining and promoting, as and for its employees, the named defendants "officers" in this action, in that said employee(s), individually or collectively, lacked the experience, deportment and ability to be employed by the defendants in the capacity in which they were utilized, i.e. as police officers and/or in supervisors roles.

297.     That, upon information and belief, the defendant, "City" failed to exercise due care and caution in its hiring and promoting practices. Upon information and belief the defendant "City" failed to investigate the above named Officer's backgrounds; the City failed to properly train, supervise and monitor the "officers", that the city continued to retain employ and promote said officers after being placed on notice of prior acts of misconduct and the defendants, their agents, servants and employees, were otherwise careless, negligent and reckless.

298.     That each defendant "officer" while acting within the scope of his employment, was reckless or grossly negligent in that each failed to use such care in the performance of his police duties as a reasonably prudent and careful police officer would have used under similar circumstances.

299.     That each of the officers was negligent, careless and reckless in the manner in which they executed and/or performed his police duties on the date and at the location specified herein.

300.     Upon information and belief the police department permitted or condoned the false arrest, and/or false documentation submitted by these and other officers; use of force, use of excessive force, failure to intervene and/or report misconduct, and in that the defendants, their agents, servants and/or employees were otherwise careless, reckless and negligent.

301.     That the aforesaid occurrence, to wit: assault and battery, false arrest and imprisonment, and the resulting injuries to mind and body therefrom, was caused wholly and solely by reason of the negligence of the defendants, its agents, servants and/or employees without any negligence on the part of the plaintiff Curran-Groome contributing thereto.

302.     That by reason of the aforesaid, Curran-Groome was injured in mind and body, still suffers and upon information and belief will continue to suffer great physical and mental pain, and she was thereby damaged.

303.     Upon information and belief, Curran-Groome expended and incurred divers sums of money in an effort to cure herself of said injuries and to extricate herself from the indignities and humiliation foisted upon him by the actions of the defendants, their agents, servants and/or employees. Upon information and belief, Curran-Groome will be required to expend further sums, and the plaintiff has been otherwise damaged.

304.     That by reason of the aforesaid, Curran-Groome has been damaged in a sum exceeding the jurisdictional limits of the lower courts.

305.     That by reason of the aforesaid, Curran-Groome was injured in mind and body, still suffers and upon information and belief will continue to suffer great physical and mental pain, and she was thereby damaged.

**AS AND FOR THE SEVENTH CAUSES OF ACTION: ALLEGING VIOLATIONS OF CONSTITUTIONAL RIGHTS UNDER 42 U.S.C. SECTIONS 1983 AND 1988 AGAINST MONAHAN, TEJADA, HALDEMAN, AND JOHN/JANE DOES #1-2 EACH IN HIS OR HER INDIVIDUAL CAPACITY AND AS AN AGENT OF THE CITY OF NEW YORK, PLAINTIFF ALLEGES:**

306.     The plaintiff, repeats, reiterates, and realleges each and every allegation contained in paragraphs marked "1" through "298" with the same force and effect as if more fully and at length set forth herein.

307.     That at all times hereinbefore and hereinafter mentioned, the "Defendant Officers" were employed by the defendant The City of New York and/or The New York City Police Department and each was acting under the color of his official capacity and his or her acts were performed under the color of the policies, statutes, ordinances, rules and regulations of The City of New York.

308.     That at all times hereinbefore and hereinafter mentioned, the "defendant officers" were acting pursuant to orders and directives from defendant, the City of New York.

309.     That during at all times hereinbefore and hereinafter mentioned, the "defendant officers," individually, and/or collectively with others acted under color and pretense of law, to wit: under color of the statues, ordinances, regulations, customs and usages of The City of New York and/or New York City Police Department, and engaged in the illegal

61

conduct set forth this complaint to the injury of the plaintiff, Curran-Groome, and

deprived her of the rights, privileges and immunities secured to each by the First, Fourth,

and Fourteenth Amendments to the Constitution of the United States and the laws of the

United States, and State of New York and/or U.S.C Sections 1983.

310.      That during all times hereinafter mentioned, the "defendant officers,"

individually, and/or collectively with others acted under color and pretense of law, to wit:

under color of statues, ordinances, regulations, customs and usages of The City of New

York and/or New York City Police Department, and engaged in the illegal conduct set

forth this complaint, conspired to engage in said conduct committed upon the plaintiff

and deprived her of her rights, privileges and immunities secured to him or her by the

Fourth and Fourteenth Amendments to the Constitution of the United States and the laws

of the United States, and State of New York and/or 42 U.S.C. Section 1983.

311.      That the unlawful and illegal conduct of the" defendant officers" deprived

plaintiff Curran-Groome, of the following rights, privileges and immunities secured to

him or her by the Constitution of the United States and of the State of New York:

i.   The right of plaintiff to be secure in his person and effects against unreasonable search
     and seizure under the Fourth and Fourteenth Amendments to the Constitution of the
     United States; and,

ii.  The right to equal protection under the law

iii. The right not to be subjected to cruel and unusual punishment, including excessive force.

iv.  The right of freedom of speech and expression under the First and Fourteenth
     Amendment.

312.     That by reason of the aforesaid violations, use of  force, use of arbitrary,

excessive force, seizure of plaintiff' persons , false arrest and false imprisonment, assault

and battery, falsifying evidence, discrimination and malicious prosecution, and

conspiracy to commit the above the "defendant officers" violated Curran-Groome' rights

and privileges as provided to her in the Constitution of the United States of America, and

provided to her in the Constitution of the State of New York, and laws thereto, "the

officers" and violated 42 U.S.C 1983.

313.     That by reason of the aforesaid, plaintiff Curran-Groome was injured in mind and

body, still suffers and upon information and belief, will continue to suffer great physical

and mental pain.

**AS AND FOR EIGHT CAUSES OF ACTION FOR MUNICIPAL LIABILITY
PURSUANT TO 42 U.S.C. AND 1983 AND MONELL V. DEPARTMENT OF SOCIAL
SERVICES, 436 U.S. 658 (1978) FOR DEFENDANTS' VIOLATIONS OF PLAINTIFF
CURRAN-GROOME'S RIGHTS UNDER THE FIRST, FOURTH, AND FOURTEENTH
AMENDMENTS TO THE UNITED STATES CONSTITUTION AGAINST DEFENDANT
CITY OF NEW YORK, DERMOT SHEA, AND TERRENCE MONAHAN AND LEHR**

314.     The plaintiff, repeat, reiterate, and reallege each and every allegation contained in

paragraphs marked "1" through "309" with the same force and effect as if more fully and

at length set forth herein.

315.     The facts pleaded above describe the policies, practices, and customs or deliberate

in difference thereto by defendant City, including, but not limited to: uses of excessive

force, and false arrests, and unreasonable restrictions on protestors' First Amendment-

protected conduct, often without fair warning; employing crowd control tactics such as pushing, corralling, encircling, or otherwise trapping protestors, without fair warning; the absence of adequately clear standards to guide police officials' extremely broad discretion to arrest anyone at their whim, based on *ad hoc* determinations as to their perceived violations, without fair warning; using flex-cuffs for protest-related arrests, while failing to supply officers with protective padding and adequate numbers of cutting tools to loosen or remove flex-cuffs, while and/or to ensure that such cutting tools are readily available when needed; failing to loosen or remove overtight cuffs; and subjecting arrestees to lengthy detentions and lengthy detentions and arrest processing at centralized arrest processing locations, exposing them to searches, property seizures, and unhealthy and conditions of confinements, in lieu of brief street detentions, and the retention of officers who had previously been accused or found to have engaged in excessive use of force.

316.     All of wrongful acts or omissions complained of herein were carried out by the individual named and unnamed police officer defendants pursuant to: (a) formal polices, rules, and procedures of Defendant City; (b) actions and decisions by defendant City's policymaking agents including, but not limited to, defendant Shea, and defendant Monahan, and defendant Lehr; (c) customs, practices, and usage of the NYPD that are so widespread and pervasive as to constitute *de facto* policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by defendant City, defendant Shea,

defendant Monahan, defendant Lehr, and other policymaking officials; (d) defendant

City's deliberate indifference to Plaintiffs' rights secured by the First, Fourth, and

Fourteenth Amendments of the United States Constitution, as evidenced by the City's

failures, and the failures of the City's policymaking agents, to train, supervise, and

discipline NYPD officers, despite full knowledge of the officers' wrongful acts, as

described herein.

317.     That as a proximate cause of the City's actions, customs, policies, practices or

other widespread deliberate indifference thereto, the plaintiff was falsely arrested,

subjected to excessive force, were imprisoned, excessively detained, injured, physically

and emotionally, denied prompt and necessary medical attention and as such they were

proximately damaged and were harmed.

318.     Further each plaintiff seeks compensatory damages, legal fees, costs and

disbursements.

## AS AND FOR TWENTY FIFTH THROUGH TWENTY SEVENTH CAUSES OF ACTION INCLUDING PUNITIVE DAMAGES AGAINST ALL DEFENDANTS

319.     The plaintiff, repeat, reiterate, and reallege each and every allegation contained in

paragraphs marked "1" through "314" with the same force and effect as if more fully and

at length set forth herein. Defendants intentionally, negligently, and for the purpose of

causing severe emotional distress, recklessly conducted themselves towards decedent in a

manner so shocking and outrageous that it exceeded all reasonable bounds of decency,

wanton disregard, gross negligence, causing him to suffer personal injuries, conscious

pain and suffering, loss of enjoyment of life, emotional upset, shock and fright, fear of impending death.

320.     As a result of the foregoing, Plaintiffs were caused to suffer personal injuries, conscious pain and suffering and loss of enjoyment of life and loss of freedom, deprivation of rights, shock and fright and emotional upset that would naturally arise from such an incident, humiliation, mental anguish, injury and inconvenience, expenses incurred and damages to reputation caused by the wanton, reckless and grossly negligent nature of the conduct of the individual police officers, and is entitled to punitive damages; attorney's fees; costs; disbursements; expenses; and interest in this matter from the defendants.

## **JURY DEMAND**

**Plaintiffs hereby demand a trial by jury on all counts.**

**WHEREFORE**, the plaintiff demand judgment against the defendants in a sum to be determined by the trial of fact, plus costs, attorney's fees, disbursements, legal and statutory interest and such other relief as to the court seems just and proper on the first through the twenty-fourth causes of action, plus attorney's fees, costs, disbursements and (on the nineteenth through twenty-fourth causes of action), punitive damages on the nineteenth through twenty-first  and twenty fifth through twenty-seventh causes of action and such further relief as to the court seems just and proper.

DATED:     New York, New York
            January 31, 2022

s/Christopher Smith

_____

Christopher A. Smith, Esq.,
*Attorney for the Plaintiff*
360 East 161st Street
Bronx, New York 10451
(347) 676-0704
ChristopherSmith104@gmail.com

s/Elena Cohen

_____

Cohen Green PLLC
BY: Elena  L. Cohen, Esq.
*Attorney for the Plaintiff*
1639 Centre Street, Suite 216
Ridgewood, NY 11385
(929) 888-9650
elena@femmelaw.com

67